UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ALEXANDER WHEELER,

                           Plaintiff,

              -against-

BRAC INTERNATIONAL,

                           Defendant.
-------------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #:_____
DATE FILED: 6/18/2025

**23-CV-9509 (GHW) (KHP)**

**REPORT AND RECOMMENDATION
ON MOTION TO DISMISS THIRD
AMENDED COMPLAINT**

**TO:     THE HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Alexander Wheeler ("Plaintiff" or "Wheeler") brings this action against

Defendant Stichting BRAC International ("Defendant" or "BRAC International") asserting claims

for (1) negligent supervision and direction, (2) negligent, reckless, and willful misconduct, (3)

negligent infliction of emotional distress, (4) negligent retention, (5) fraud, and (6) fraudulent

inducement, arising out of Plaintiff's work placement at BRAC Sierra Leone. After jurisdictional

discovery, Defendant now moves to dismiss the Third Amended Complaint ("TAC") pursuant to

Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction or, alternatively, Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons set forth below, I

respectfully recommend that Defendant's Motion to Dismiss be GRANTED.

**BACKGROUND**[1]

1. **The BRAC Organization and Entities**

BRAC International is an international non-profit/non-governmental organization ("NGO") headquartered in the Netherlands.[2]  TAC ¶ 12.  It is one of the largest development organizations in the world, with over 8,600 employees located throughout the world.  TAC ¶ 135.  BRAC International is not registered to conduct business in New York, does not have any office in New York, and does not maintain any bank account in New York.  ECF No. 54.  BRAC USA, Inc. ("BRAC USA") is a domestic, not-for-profit corporation located in New York that primarily does fundraising for BRAC International and other BRAC entities worldwide.[3]  TAC ¶¶ 20, 27, 30, 74.  Its employees allegedly tell donors they are agents or representatives of BRAC International when fundraising.  TAC ¶ 144.  BRAC Sierra Leone and BRAC Liberia are locally registered non-profit entities which are branches/affiliates of BRAC International.[4]  ECF No. 57-11.

2. **BRAC International Leadership and Activities**

Dr. Muhammad Musa, is the former Executive Director of BRAC International (May 1, 2019-July 31, 2021) and former Board Member of BRAC USA (April 2016-May 2019).  He was an employee of BRAC USA, but seconded to BRAC International.  ECF Nos. 60-7 & 8.  BRAC USA invoiced BRAC International for 89% (32 hours) of Dr. Musa's salary, while the remaining

---

[1] This background is taken primarily from facts alleged in the TAC and Plaintiff's Statement of Facts and Exhibits submitted in connection with his opposition to the Motion to Dismiss.  ECF Nos. 52, 59-60.

[2] *See also* https://bracinternational.org/aboutus/ (last visited May 30, 2025).

[3] *See also* https://bracusa.org/ (last visited May 30, 2025).

[4] *See also* https://bracinternational.org/sierra-leone/ and https://bracinternational.org/liberia/ (last visited May 30, 2025).

portion of his salary was paid for through a grant.  ECF No. 60-8.  He received health benefits

through BRAC USA; however, he was instructed to follow the employment policies of BRAC

International.  ECF Nos. 60-7 & 8.

Dr. Musa's employment letter for the Executive Director role, signed by Donella Rapier,

then President and CEO of BRAC USA, stated that his time was to be "allocated between BRAC

International, 32 hours per week or 89 percent, and BRAC USA, four hours per week or 11

percent" and he was to work out of BRAC USA's New York City office.  TAC ¶¶ 138-39; ECF No.

60-7.  The job description for Dr. Musa's position states that the location of the job will include

"significant periods of time in Dhaka, where [BRAC International's] operational support services

are co-located at the headquarters of BRAC Bangladesh, and in the Netherlands."  ECF No. 60-6.

Additionally, his employment letter states that for the "BRAC USA portion" of his time, he was

expected to "travel within the United States . . . to meet with key donors."  ECF No. 60-7.  In

point of fact, however, during the relevant period when he was not traveling, he worked mostly

out of his home in New Jersey.  ECF No. 57-11.

Dr. Musa's job description provided he was to work "in close partnership" with BRAC

USA (and other BRAC entities) "to achieve organizational change under BRAC's global strategy."

ECF No. 60-6.  While in the role, Dr. Musa made presentations to BRAC USA's Board in New

York to justify BRAC International's receipt of grant funding from BRAC USA.  TAC ¶¶ 151, 155,

157.  Dr. Musa also worked closely with Ashley Toombs, Head of BRAC USA's Development and

Fundraising Team, to secure donations for BRAC International and its affiliates throughout the

world.[5]  TAC ¶¶ 145-46.  Toombs was employed by BRAC USA but assigned to work for BRAC International.  ECF Nos. 60-10 & 11.

In addition to fundraising, Dr. Musa worked closely with BRAC USA employee Jess Hagler, a dual employee of BRAC USA and BRAC International, who assisted Dr. Musa in preparing strategic planning documents, internal and external presentations, letters and emails for BRAC International.[6]  TAC ¶¶ 100-126; ECF No. 60-9.  Dr. Musa also sent out offer letters from New York for high-level positions with BRAC International located in other parts of the world.  TAC ¶¶ 72, 159.  Plaintiff alleges Dr. Musa had the authority to hire, fire, manage and discipline BRAC International employees throughout the world (including at BRAC Sierra Leone).  TAC ¶¶ 45, 129-31, 158, 196-204, 312-22.  Dr. Musa's job description states that he had 8-10 direct reports and indirect oversight over approximately 8,000 employees.  ECF No. 60-6.

BRAC International's senior leadership, including its current Executive Director Shameran Abed, travel to New York City nearly every September during the United Nations ("UN") General Assembly to meet with heads of major United States-based philanthropic foundations, including many based in New York, to broker donations, grants and other funding arrangements.  TAC ¶¶ 29, 61-62.  From 2018 to 2023, while in New York for the UN General Assembly meetings, BRAC International employees attended thirty-six meetings, although the purpose of all such meetings is unclear.  TAC ¶ 73.  Plaintiff alleges that BRAC International

---

[5] Plaintiff asserts BRAC International employed several other individuals who were physically based in New York including Bobby Irven, Paul Taylor, Saara Kumar, and Shaili Kapadia.  TAC ¶¶ 31, 70.  Jurisdictional discovery showed that none of these individuals were technically employed by BRAC International at the time Plaintiff filed his complaint.  ECF No. 57-11.  Rather, they were employed by an entity called Elements Global Services Inc., BRAC International's "designated employer of record."  ECF Nos. 60-13 & 14.
[6] Hagler first held the position of Associate and then was promoted to a Coordinator role.  ECF No. 59-4.

employees come to New York to meet with BRAC USA staff as well as to meet with bilateral and multilateral NGOs and other philanthropies at other unspecified times to solicit funding and other support.[7]  TAC ¶¶ 64-65, 73.  BRAC International receives millions of dollars in funding from New York-based bank accounts of various philanthropies, although this accounts for ten percent or less of its total funding.  TAC ¶¶ 27, 30; SOF ¶ 16 (less than 2% of BRAC International's funding comes from New York-based donors); TAC ¶ 27 (approximately 10% of BRAC International's funding comes from New York).  Some of the funding coming from New York has been used for projects at BRAC Sierra Leone and BRAC Liberia.  TAC ¶¶ 27, 29, 77-80. Additionally, BRAC International signed contracts with BRAC USA pursuant to which BRAC USA provided grants or other funds to BRAC International, some of which were used for BRAC Sierra Leone activities.  TAC ¶¶ 33-34, 83.  BRAC International had to carefully follow BRAC USA's instructions regarding use of funds, and contracts require BRAC International to provide various information to BRAC USA about use of the funds and compliance with the terms of the funding contracts.  TAC ¶ 153.  It is not clear where the various funding contracts were signed and negotiated.  Finally, Plaintiff alleges that BRAC International received legal advice and accounting help through BRAC USA.  TAC ¶¶ 31, 32.

**3. BRAC Sierra Leone Funding Through BRAC International**

BRAC USA and BRAC International were parties to a contract that provided funding to BRAC Sierra Leone.  SOF ¶¶ 103-110; ECF No. 57-11.  The agreement was signed by Rapier (at

---

[7] Examples of entities with which BRAC International has had meetings in New York include Open Society Foundation, the Bill & Melinda Gates Foundation, Sesame Workshop, the Clinton Foundation, the World Bank, the Hilton Foundation, and various other UN-related persons and funds.  TAC ¶ 73.  It is not clear whether these entities are all based in New York or whether the meetings just happened to be in New York.

BRAC USA) and Lamia Rashid, BRAC International's former Regional Director of Africa. It is not

clear where Rashid was when she signed the agreement or how and where the contract was

negotiated. The agreement provided for a grant in the amount of $242,465 for the period May

1, 2019 to May 1, 2021. The contract specified that the funds had to be used for the purpose of

the grant and required BRAC International to provide BRAC USA with various information about

the use of the funds. The contract also required BRAC International to agree to run its

operations in Sierra Leone in accordance with all applicable United States and Sierra Leone

laws. It also contained a procedure for reporting fraud or other inappropriate activity

impacting programs funded by the grant. The procedures required BRAC International to

inform BRAC USA of the issue, conduct an investigation within 30 business days, and send a

written summary of the finding to BRAC USA. A failure to comply could result in revocation of

the grant. SOF ¶¶ 103-110; ECF No. 57-11.

### 4. Plaintiff's Employment at BRAC USA

On October 1, 2018, Plaintiff was hired as a Development Associate by BRAC USA to

work in its New York City headquarters. TAC ¶ 177. On December 16, 2020, Plaintiff's

supervisor, Daniel Stoner, Chief Program Officer of BRAC USA, offered Plaintiff an opportunity

to work for BRAC International's subsidiary organizations in West Africa, BRAC Sierra Leone and

BRAC Liberia. TAC ¶¶ 37, 39, 183. Thereafter, Plaintiff attended a video call with Stoner and

Idrissa Kamara, former Country Director of BRAC Sierra Leone and BRAC Liberia. During the

call, Kamara (who was located in West Africa) attempted to convince Plaintiff to accept a

temporary assignment in West Africa by speaking in glowing terms and with reassuring

encouragement about the opportunity and failing to disclose any prior or ongoing "unethical, immoral, or unlawful activities" at BRAC Sierra Leone.  TAC ¶¶ 42, 52, 184-85.

On or about January 13, 2021, Plaintiff was formally offered a "temporary assignment" in West Africa.  TAC ¶ 186.  The offer letter explained the "Terms and Conditions" of Plaintiff's assignment as follows:

- During this assignment, you will be seconded by BRAC USA to work as a Program Officer to BRAC Sierra Leone and BRAC Liberia.
- You will report to the Country Director and also coordinate with Dan Stoner, BRAC USA's Chief Program Officer for administrative needs associated with BRAC USA terms of employment (e.g., vacation, health insurance, etc.).
- You will spend 4-6 months working with the Country Director in both Freetown and Monrovia (traveling overland), with the chief objectives of new business mobilization, proposal development, systems strengthening, and comprehensive support to the Country Director.

TAC ¶ 188.  The letter also stated that "[f]or the duration of this assignment, you will remain employed by BRAC USA."  TAC ¶ 189.  The letter further stated that Plaintiff would "participate in the CIGNA health care plan, which has been obtained by BRAC International."  ECF No. 67-1.  The letter noted that "[t]his international assignment can be modified at any time by mutual agreement between [Plaintiff], the Regional Director for Africa-BRAC International and the CEO of BRAC USA.  *Id.*  The letter was signed by Rapier and Ruth Okowa, former Africa Regional Director of BRAC International.  TAC ¶¶ 41, 51, 187.  Plaintiff accepted the offer, and on January 28, 2021, Plaintiff moved to West Africa.[8]  TAC ¶ 207.  Before leaving for the assignment,

---

[8] There is no dispute that BRAC International was never Plaintiff's employer.  Plaintiff admits that BRAC International did not hire him, never formally employed him, has never been his employer, never paid his salary, never provided him with benefits, did not determine his amount of salary and method of salary payment, and did not maintain his employment records.  TAC ¶¶ 190-91, 193-94.

Plaintiff told Stoner that he wanted to continue to work at BRAC USA in New York City after he completed the temporary assignment.  TAC ¶ 205.

 Plaintiff spent less than four months in West Africa because he alleges he was forced to resign and return to the United States after learning BRAC Sierra Leone was a corrupt organization where people in leadership there were sexually exploiting female employees and job applicants, embezzling donated funds, and defrauding BRAC International and donors.  He claims that he raised concerns about this conduct with his superiors at BRAC USA and individuals at BRAC Sierra Leone and BRAC International, but nothing was done and he was put in an impossible position and suffered extreme emotional distress as a result.  Although he wanted to return to BRAC USA, he was not rehired there upon his return to the United States. Some of the specifics of the situation as alleged in the TAC are as follows.

Upon arriving in Liberia to begin his temporary assignment, Kamara told Plaintiff that there was a "leadership crisis" and ongoing criminal activity at BRAC Sierra Leone and people he was supposed to report to in Sierra Leone were corrupt.  TAC ¶ 207.  These people, according to Kamara, were Edwin Worneh Jarfoi, former Head of Human Resources and Training for BRAC Sierra Leone, and Prince Momoh, former Head of Finance for BRAC Sierra Leone.  According to Kamara, Jarfoi and Momoh were using their positions of authority to obtain sexual favors from female job applicants and employees.  TAC ¶¶ 208, 215-17, 253.  It was also public knowledge that BRAC Sierra Leone operated an unethical money-lending scheme that entailed it failing to fully explain the conditions of loans to borrowers or ensure they could afford the high interest rates associated with such loans.  TAC ¶¶ 211-12.  Plaintiff urged Kamara to do something

about the situation. TAC ¶ 224. But, Kamara did not fully investigate, discipline or terminate Jarfoi and Momoh allegedly because they had powerful family connections in Sierra Leone, including in government and finance, and doing so could jeopardize BRAC Sierra Leone's ability to obtain an essential loan from Sierra Leone's Central Bank. TAC ¶¶ 220-23.

In February, Plaintiff informed Stoner (at BRAC USA) about Jarfoi's and Momoh's sexual misconduct. TAC ¶¶ 226-31. Stoner asked Plaintiff to investigate the matter, but this put Plaintiff in a difficult position because Jarfoi and Momoh were his superiors and Plaintiff also feared for his physical safety. TAC ¶¶ 232-33, 273-76. Plaintiff also called Cathy Naughton, Director of Human Resources at BRAC USA, to tell her about the ongoing misconduct taking place at BRAC Sierra Leone and noted that BRAC International and BRAC Sierra Leone had contractual safeguarding obligations that they might not be meeting. TAC ¶¶ 49, 244-46. Naughton, however, stated she did not know how to handle the situation at BRAC Sierra Leone and took no further action. TAC ¶¶ 247-48. Plaintiff also informed Rapier (at BRAC USA) of Jarfoi's and Momoh's misconduct. TAC ¶ 237. He also told her that Kamara was not taking proper action and covering up the existence of the problem to BRAC Sierra Leone's Board and the public, as well as lying about whether Jarfoi and Momoh were still employed. TAC ¶¶ 237, 290-92. Rapier responded by looping in Stoner to ensure he knew about the situation but did not otherwise take any action to address the situation at BRAC Sierra Leone. TAC ¶¶ 240, 242. Plaintiff also told Audrey Ahwan, former Director of Program Development at BRAC International, about the situation, who purportedly did not doubt that misconduct was occurring. TAC ¶¶ 50, 265.

That month, however, Alonso Davis, former Finance Manager at BRAC Liberia and BRAC Sierra Leone, began to investigate Jarfoi's and Momoh's misconduct.  TAC ¶ 257.  Davis concluded that Jarfoi and Momoh had committed sexual misconduct.  TAC ¶¶ 261-63.  Although not entirely clear from the complaint, it appears that Davis reported his findings to BRAC International, but Kamara told Plaintiff that BRAC International leadership was "pushing back" on Davis's conclusion supposedly because it was concerned an adverse finding against Jarfoi and Momoh might harm BRAC Sierra Leone's ability to secure a $2,500,000 loan from Sierra Leone's Central Bank, where Jarfoi and Momoh had family connections.  TAC ¶ 264.

In additional to the sexual misconduct discussed above, Plaintiff alleges he learned of financial irregularities and embezzlement in the course of his first month at BRAC Sierra Leone.  This included misstating an employee's salary as $2,500 a month on donor-facing budgets while in reality paying the employee only $500 (TAC ¶¶ 271-72); charging BRAC USA $1,200 per month for Plaintiff's lodging at Kamara's family compound in Freetown, Sierra Leone (TAC ¶¶ 249-51); and asking Plaintiff to use BRAC Sierra Leone funds to purchase personal items for Kamara (TAC ¶ 252).  Additionally, Plaintiff alleges that Kamara and Stoner directed him to secure funds through BRAC Sierra Leone's agreement with the Global Innovation Fund ("GIF"), even though BRAC Sierra Leone was not operating in compliance with the law or the agreement's safeguarding requirements.  TAC ¶¶ 277-89, 298-300, 308-11.

Dr. Musa at some unspecified point in time was aware of the issues in Sierra Leone and allegedly participated in meetings with BRAC International about terminating Kamara's

10

employment with BRAC Sierra Leone but did not utilize his authority to do so.  ECF No. 59-4 ¶¶ 73-84.

In mid-March, 2021, Kamara told Plaintiff that Jarfoi and Momoh were going to resign but would continue to work for BRAC Sierra Leone and receive full salaries until at least March 31, 2021, and, thereafter, Jarfoi and Momoh would be placed on medical leave.  TAC ¶¶ 301-03.  Kamara told Plaintiff that he had to keep Jarfoi and Momoh on payroll so that BRAC Sierra Leone would receive the $2,500,000 loan from Sierra Leone's Central Bank.  TAC ¶¶ 306-07.

Plaintiff contends that he experienced such stress from the situation in Sierra Leone that he sought mental health counseling from The Center of Prevention and Evaluation ("COPE") at Columbia University—which he was able to obtain through remote/virtual appointments.  TAC ¶¶ 331-33.  Ultimately, on April 13, 2021, Plaintiff resigned due to the stress he experienced from working at BRAC Sierra Leone.  TAC ¶¶ 339, 341.  Rapier (at BRAC USA) allegedly said she understood why Plaintiff felt he had to resign (TAC ¶¶ 343-44), and Stoner said he was not surprised either (TAC ¶ 347).  BRAC USA did not offer Plaintiff the option of transferring back to BRAC USA's New York City headquarters.  TAC ¶ 340.  Upon his return to New York, Plaintiff continued mental health treatment through COPE in person.  TAC ¶¶ 349-52.  Plaintiff alleges that he would never have accepted the secondment had he been told the true facts concerning the ongoing unethical, immoral, and illegal activities at BRAC Sierra Leone.  TAC ¶ 417.

### 5.  Plaintiff's Claims

Plaintiff claims BRAC International owed him a duty of care to protect him from being exposed to "unethical, immoral, and illegal activities" while he was on temporary assignment in

11

West Africa because BRAC International had the ultimate authority over the day-to-day operations of BRAC Sierra Leone and its staff.  He asserts BRAC International was negligent in hiring, supervising and retaining corrupt employees at BRAC Sierra Leone (i.e., Jarfoi, Momoh and Kamara), whose "unethical, immoral, and illegal" misconduct so infected the workplace that Plaintiff was forced to resign.  His theory is that BRAC International "carelessly, negligently, recklessly, willfully, and intentionally failed to have in place an appropriate policy and/or practice for making hiring, assignment, and retention decisions to protect" Plaintiff.  TAC ¶ 369. He asserts BRAC International also negligently caused him emotional distress by virtue of its failure to properly address and end the corruption and misconduct after learning of it.  Finally, he claims he was fraudulently induced by BRAC International to accept the secondment by Kamara's omission of critical facts (i.e., the corruption and misconduct of individuals in leadership positions at BRAC Sierra Leone) and harmed by virtue of these omissions when he was forced to endure emotionally distressing employment circumstances that led to his resignation/constructive discharge.  He also asserts that Kamara committed fraud by making two misrepresentations to him in February 2021 concerning whether Jarfoi and Momoh were going to be dismissed from their positions.  He says he relied on those misrepresentations when he participated in a BRAC Sierra Leone Board meeting and solicited donors on behalf of BRAC Sierra Leone.

**PROCEDURAL HISTORY**

On April 7, 2023, Plaintiff filed suit against BRAC USA in the Supreme Court of New York. ECF No. 1.  On May 24, 2023, Plaintiff amended the complaint to add BRAC International as a

Defendant. *Id.* On October 2, 2023, the Honorable Richard Latin of the Supreme Court of New York issued a decision granting BRAC USA's motion to dismiss the complaint, which left Plaintiff's claims against BRAC International. *Id.* On October 30, 2023, BRAC International filed a notice of removal to the Southern District of New York. *Id.*

On January 4, 2024, the parties appeared before the undersigned for a case management conference at which Defendant indicated it intended to file a motion to dismiss the complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). In advance of that motion, the Court allowed discovery on issues of personal jurisdiction. ECF No. 19. Following the completion of personal jurisdiction discovery, Plaintiff filed a Second Amended Complaint ("SAC") on July 11, 2024. ECF No. 34. On August 1, 2025, Defendant filed a motion to strike all exhibits attached to the SAC under Rules 12(f) and 8(a), along with the allegations that incorporate those documents. ECF No. 40. On October 3, 2024, the Court issued an order granting in part and denying in part Defendant's motion to strike and ordering Plaintiff, *inter alia*, to file a third amended complaint consistent with the Court's order. ECF No. 50. On October 10, 2024, Plaintiff filed his TAC. ECF No. 52. The instant motion is aimed at the TAC.

## **LEGAL STANDARD**

### 1. **Burdens of Proof Relevant to Establishing Personal Jurisdiction**

The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted). The showing a plaintiff must make to defeat a defendant's challenge to the court's personal

jurisdiction over it "varies depending on the procedural posture of the litigation" and the motion brought by the defendant. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (*quoting Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

Before jurisdictional discovery, the plaintiff need only make a prima facie showing of jurisdiction, and it can make this showing "solely by allegations." *Id.* at 85. Where, as here, jurisdictional discovery has been conducted and a Rule 12(b)(2) motion challenging jurisdiction has been filed, a plaintiff must make a prima facie showing of jurisdiction that is "factually supported," i.e., the showing must "include an averment of facts that, if credited by [the factfinder], would suffice to establish jurisdiction over the defendant." *Id.* (quoting *Ball*, 902 F.2d at 197). Said another way, "the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction." *Id.* (quoting *Ball*, 902 F.2d at 197). The court must "construe the pleadings and affidavits in the light most favorable to plaintiffs," and resolve all doubts, including factual disputes, in the plaintiff's favor. *Id.*; *see also S. Oil of Louisiana Inc. v. Saberioon*, 2021 WL 5180056, at *3 (S.D.N.Y. Nov. 8, 2021). Courts will not, however, "draw argumentative inferences in plaintiff's favor . . . [or] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d 659, 673 (2d Cir. 2013) (international quotation marks and citation omitted).

Courts may rely on materials outside the pleadings in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano*, 286 F.3d at 84.

**2. Principles of Personal Jurisdiction**

Personal jurisdiction is a "threshold question" that "must precede merits."  *In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 268 (2d Cir. 2001).  For a federal court to lawfully exercise personal jurisdiction over a party, three primary requirements must be met: the plaintiff's service of process on the defendant must have been procedurally proper; there must be a statutory basis for personal jurisdiction that renders such service of process effective; and an exercise of personal jurisdiction must be consistent with federal due process requirements. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).

In a diversity case, a federal district court exercises personal jurisdiction over a party in accordance with the law of the forum state, subject to the requirements of due process under the United States Constitution.  *See Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  Plaintiff here relies on New York's Civil Practice Law and Rules ("CPLR") Sections 301 and 302 to establish jurisdiction.  Section 301 provides for general jurisdiction over corporations that do business in New York.  N.Y. C.P.L.R. § 301.  In general, courts "may assert general jurisdiction over a foreign defendant to hear any and all claims against that defendant only when the defendant's affiliations with the State in which the suit is brought 'are so constant and pervasive so as to render it essentially at home in the forum State.'"  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)).  CPLR Section 302 is New York's long-arm statute that provides for specific jurisdiction over a defendant under certain circumstances.  *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945)).  In general, "[s]pecific jurisdiction . . . depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Under both provisions, as noted above, jurisdiction also must be consistent with Constitutional principles of due process.  *Ball*, 902 F.2d at 200.

### 3.  Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'"  *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 570).  Where a plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.  Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Twombly*, 550 U.S. at 545.

"In reviewing a motion to dismiss, a court may consider, *inter alia*, (1) documents that are incorporated by reference into the complaint, and (2) documents that, even if not

incorporated by reference, the defendant has notice of and that are 'integral' to the complaint without converting the motion to dismiss to a motion for summary judgment."  *Whiddon v. Buzzfeed, Inc.*, 638 F.Supp.3d 342, 349 (S.D.N.Y. 2022) (citing *BankUnited, N.A. v. Merritt Env't Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).

## DISCUSSION

### A.  PERSONAL JURISDICTION

Although Plaintiff asserts both general and specific jurisdiction, he primarily relies on specific jurisdiction on the theory that his lawsuit emanates from his secondment to BRAC International secured via an offer letter signed by BRAC International and BRAC USA.  He asserts that BRAC International transacted with a New York-based entity (BRAC USA) to procure the services of Plaintiff, who was employed out of New York and that the claims all arise out of this transaction.

In resolving a question of specific jurisdiction over a defendant, a district court must conduct a two-part inquiry.  First, it must determine whether the plaintiff has shown that the defendant is amendable to service of process under the forum state's long-arm statute; and second, it must assess whether the court's assertion of jurisdiction under the state's laws comport with the requirements of due process.  *Metro. Life Ins. Co. v. Robertson Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

New York's long-arm statute provides four categories of conduct that justify specific jurisdiction, including: (1) transacting business within the state or supplying services in the

17

state; (2) committing a tortious act within the state; (3) committing a tortious act without the state causing injury to person or property within the state if he (i) regularly does or solicits business in the state, or (ii) should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; and (4) using or possessing real property within the state. N.Y. C.P.L.R. § 302(a). Plaintiff asserts specific jurisdiction is appropriate under each of the first three grounds – CPLR Sections 302(a)(1), 302(a)(2), and 302(a)(3).

To establish jurisdiction over a non-domiciliary defendant under CPLR Section 302(a)(1), a plaintiff must show that the defendant (1) "transacts any business within the state" and that (2) "the plaintiff's claim arises from the business that the non-domiciliary transacted in New York." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013). "Where the claim arises out of, or relates to, the defendant's contacts with the forum . . . minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* at 170 (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotations omitted)). "[P]urposeful availment occurs when the locus of contracting or performance is New York or the defendant projects itself into New York for the purpose of creating a business relationship." *Madison Cap. Markets, LLC v. Starneth Eur. B.V.*, No. 15 CIV. 7213, 2016 WL 4484251, at *9 (S.D.N.Y. Aug. 23, 2016) (internal quotations omitted). For jurisdiction to apply, there must be "a substantial nexus" between the business transaction and the claim. *Id.* A "court must look at the totality of the circumstances to determine the

existence of purposeful activity and may not subject the defendant to jurisdiction based on 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.*

Plaintiff has put forward persuasive facts that constitute a prima facie showing of specific jurisdiction under this section of the CPLR – all that is required to defeat Defendant's Rule 12(b)(2) motion.  To start, Plaintiff's claims arise from his secondment to BRAC International.  This arrangement arose because BRAC International sought personnel from BRAC USA in New York and entered into a contract with BRAC USA to secure that personnel (i.e., Plaintiff).  Okowa, Africa Regional Director of BRAC International, signed the offer letter, which was co-signed by BRAC USA's former CEO, Rapier.  Notably, this arrangement was not unusual.  Indeed, Dr. Musa also was an employee of BRAC USA seconded to BRAC International who allocated work time to both entities.  Toombs, who helped Dr. Musa with fundraising, similarly was employed by BRAC USA but assigned to work for BRAC International.  Hagler too was treated as a dual employee of BRAC International and BRAC USA.  Thus, the facts show that BRAC International on multiple occasions sought out the assistance of its New York-based affiliate to utilize its New York-based personnel through secondments or similar contractual arrangements.  In other words, it projected itself into New York to obtain personnel from its New York-based affiliate through contractual arrangements.  *See Fishbarg v. Doucet*, 9 N.Y.3d 375 (2007) (applying CPLR Section 302(a)(1) to California-based defendants based on contract with New York lawyer who represented them in Oregon); *see also Business Casual Holdings, LLC v. TV-Novosti*, 2023 WL 1809707, at *5 (S.D.N.Y. Feb. 8, 2023) (in copyright case, finding jurisdiction under CPLR Section 302(a)(1) where Russian non-profit purposely directed videos to

United States viewers, had at least one New York-based correspondent, and had a New York-based studio and camera crew); Cf *Yih v. Taiwan Semiconductor Manufacturing Co.*, 815 Fed.Appx. 571 (2d Cir. 2020) (recognizing that when an out-of-state defendant affirmatively reaches out to a plaintiff in New York to establish and does establish a contractual relationship, long-arm jurisdiction applies, even if work performed under contract is out of state); *Lear v. Royal Caribbean Cruises Ltd.*, 20-cv-4660, 2021 WL 1299489 (S.D.N.Y.  Apr. 7, 2021) (insufficient contacts for long-arm jurisdiction where employer did not enter into an ongoing contractual relationship with plaintiff/employee, did not seek out and initiate contact with New York, and had minimal remote contact with the plaintiff).

Next, BRAC International entered into a contract with BRAC USA in New York to obtain funding from BRAC USA for programs in Sierra Leone (i.e., for BRAC Sierra Leone).  That contract makes clear that BRAC International was responsible for ensuring BRAC Sierra Leone complied with United States and Sierra Leone law, investigating complaints about fraudulent activity funded or supported by BRAC USA, and reporting the results to BRAC USA.  Plaintiff's complaints would seem to implicate these contractual provisions, especially his complaints about the misuse of funds, which were a significant part of the unethical and illegal conduct that forms the basis of his claims relating to BRAC International's failure to investigate and take action against the alleged wrongdoers.  It is fair to characterize this as BRAC International projecting itself into New York to enter into a contract with a New York-based affiliate to obtain funding.  While the funds were deployed to Sierra Leone, the contract was performed by BRAC USA out of New York and BRAC International had performance obligations in New York,

including reporting obligations.  And, the facts show that while in New York, Dr. Musa worked

with New York-based employees to prepare required reports for BRAC USA's Board.  *See Sills v.*

*Ronald Reagan Presidential Foundation, Inc.*, 09 Civ. 1188, 2009 WL 1490852 (S.D.N.Y. May 27,

2009) (finding long-arm jurisdiction appropriate under CPLR Section 302(a)(1) based on out-of-

state defendant actively soliciting a substantial donation from New York-based plaintiff whose

claim related to defendant's displeasure with the way the donation was used).

Additionally, Plaintiff has put forward evidence that Dr. Musa, acting on behalf of BRAC

International while in New York participated in decisionmaking about whether to terminate

Kamara's employment as a result of the misconduct that Plaintiff complained about.  This too

shows that BRAC International employees in New York were specifically involved in aspects of

the facts relating to Plaintiff's allegations.

To be sure, BRAC International is not headquartered in New York and may not be

viewed as being "at home" here for purposes of general jurisdiction.  But, there is sufficient

factual evidence proffered by Plaintiff to show that BRAC International conducted business in

New York by entering into multiple funding contracts with BRAC USA, including at least one that

provided funds to BRAC Sierra Leone, soliciting funds here from other New York-based donors,

and, most critically, conducting specific business with a New York entity to secure Plaintiff's

services in Sierra Leone for a temporary period through a secondment arrangement.  *See In re*

*Sterling Foster & Co., Inc. Sec. Litig.*, 222 F. Supp. 2d 289, 301 (E.D.N.Y. 2002) ("A single act by a

defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being

asserted.").  This nexus with New York is far from "random, fortuitous, or attenuated."  *See*

*Madison Cap. Markets, LLC*, No. 15 CIV. 7213, 2016 WL 4484251, at *9. Thus, considering the totality of the circumstances, the statutory criteria for specific jurisdiction under CPLR Section 302(a)(1) are satisfied.

This does not end the inquiry, however, as the court's exercise of personal jurisdiction over a foreign entity also must comport with due process. To satisfy due process, the defendant must have "certain minimum contacts with [the forum]" to justify the exercise of personal jurisdiction. *See Int'l Shoe Co.*, 326 U.S. at 316 (internal citations omitted). Where the claim "arises out of, or relates to, the defendant's contacts with the forum," that is, specific jurisdiction, minimum contacts exist where "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert*, 305 F.3d at 127 (internal quotation marks omitted). Additionally, the court's exercise of personal jurisdiction over the defendant must comport with "'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Metro. Life Ins. Co.*, 84 F.3d at 568 (quoting *Int'l Shoe Co.*, 326 U.S. at 316). In determining the reasonableness of the exercise of personal jurisdiction, the United States Supreme Court has instructed that the following factors are relevant to the inquiry: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive

social policies.  *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102,

113 (1987).

      Both of the above criteria are satisfied.  For the reasons discussed above, BRAC

International had sufficient minimum contacts in New York, including its repeatedly entering

into contracts with BRAC USA in New York to secure personnel and funding, its employment of

personnel who are based in New York, and its solicitation of funding from multiple New York-

based philanthropies.  Moreover, exercising personal jurisdiction over BRAC International in

this case would not be unreasonable.

      Applying the *Asahi* factors in turn, the imposition of jurisdiction over BRAC International

in New York will not inflict a significant burden on BRAC International given that its leadership

team frequently travels to New York, it is a party to multiple contracts with New York-based

entities, and documents can be exchanged electronically.  To be sure, witnesses to much of the

conduct alleged are located in West Africa;[9] however, Dr. Musa and Stoner are in New Jersey

and New York, respectively, and technology allows for video depositions.  Other witnesses are

also in New York, including Rapier and Naughton.  As to the second factor, New York has some

interest in adjudicating this case because Plaintiff is a New York citizen who worked for a New

York-based employer while on the secondment in West Africa.  While it is true that Sierra Leone

may also have an interest, this factor is at best neutral.  The third factor weighs in Plaintiff's

favor, as he has an interest in obtaining convenient and effective relief, which will be assured in

this court.  The fourth factor weighs in favor of Plaintiff, as the case can be efficiently resolved

---

[9] Kamara is deceased and will not be able to be deposed.

here in New York, whereas it is uncertain what legal process exists in Sierra Leone to address Plaintiff's claims. Finally, the fifth factor is at best neutral. Thus, it is not unreasonable to try Plaintiff's claims in New York under the circumstances of this case. *See Fishbarg*, 9 N.Y.3d 375; Cf *Yih*, 815 Fed.Appx. 571; *Lear*, 20-cv-4660, 2021 WL 1299489.

The cases on which Defendant relies do not assist its argument that long-arm jurisdiction is lacking. *Wilson v. Dantas*, 128 A.D.3d 176, 184-85 (1st Dep't 2015), aff'd 29 N.Y.3d 1051 (2017) (recognizing that the standard for finding that a plaintiff's claim "arises from" defendant's New York contacts is permissive) (citing *Licci*, 20 N.Y.3d at 340-41); *DH Servs., LLC v. Positive Impact, Inc.*, 12 Civ. 6153, 2014 WL 496875 (S.D.N.Y. Feb. 5, 2014) (defendant did not avail itself of the privilege of conducting business in New York merely by purchasing gauze pads and supplies from New York-based companies, sending a cease and desist letter to a New York company did not constitute a transaction for purposes of CPLR Section 302(a)(1); general social media ads and web-based donation page reaching New Yorkers was insufficient to be deemed conduct of business in New York; additionally there was no nexus between the trademark and unfair competition claims and the New York activities).

Having found that personal jurisdiction is appropriate under CPLR Section 302(a)(1), there is no need to address jurisdiction under the other statutory theories.[10] Thus, I turn next to the plausibility of Plaintiff's claims.

---

[10] I note, however, that establishing specific jurisdiction under CPLR Section 302(a)(2) would be difficult because there is little evidence that BRAC International was physically present in New York when committing the tortious acts through its alleged agents in West Africa. Similarly, there is little evidence that the alleged tortious acts caused injury in New York, as required under CPLR Section 302(a)(3). General jurisdiction also is questionable because it is reserved for the "exceptional case" in which the foreign defendant's contacts with the forum state are "so substantial and of such a nature as to render the corporation 'at home' in" the forum state. *SPV OSUS Ltd. v.*

### B. *12(b)(6) ANALYSIS*

BRAC International argues that the complaint should be dismissed for several reasons. First it contends Plaintiff's negligence claims are barred by the New York Workers' Compensation Law and, alternatively, that the facts pled do not support those claims. It also alleges that Plaintiff has failed to plead facts to support plausible claims for fraud and fraudulent inducement. In the initial briefing, the parties both assumed that Plaintiff could assert claims against BRAC International under New York law for conduct that occurred in Sierra Leone by employees of BRAC Sierra Leone who allegedly were agents of BRAC International. The Court, however, requested supplemental briefs on the applicability of New York law, which I address first.

### 1. Applicability of New York Law

In diversity cases, as this one, the court typically looks to the state law in the district where the case is pending to resolve choice of law issues. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 494-97 (1941); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 153 (2d Cir. 2013). Under New York choice of law rules, the court first assesses whether there is any actual conflict of laws on the issues presented. *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011). An actual conflict arises where the law of each jurisdiction 'provides different substantive rules,' and the differences are 'relevant' and have a 'significant

---

*UBS AG*, 114 F.Supp.3d 161, 168 (S.D.N.Y. 2015), *aff'd,* 882 F.3d 333 (2d Cir. 2018) (quoting *Daimler AG*, 134 S. Ct. at 761 n.19). Here, while it is true that BRAC International, a Netherlands entity, obtains funds from entities in New York, the majority of its funding is from outside of New York, as are the majority of its employees and all of its development programs. Further, there is no dispute that it does not maintain and office or bank account in New York.

possible effect on the outcome of the trial,' although they need not lead to different outcomes." *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017).

If an actual conflict exists, the court must decide which jurisdiction's substantive law controls. *Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021). In tort cases, "New York applies the law of the state with the most significant interest in the litigation." *Id.* (internal quotations omitted). In weighing the interest of the competing states, New York distinguishes between conduct-regulating rules and loss-allocating rules. *Id.* When conduct-regulating rules are at issue, New York law generally applies the law of the place where the tort occurred ("*lex loci delicti*"). *Id.*

Here, Plaintiff argues that New York law applies because Defendant's Motion to Dismiss analyzes this case under New York law, does not raise choice of law issues, and New York has the greatest interest in this litigation. But merely because Defendant analyzes this case under New York law in its Motion to Dismiss and did not initially raise choice of law issues does not mean that the Court must apply New York law. While the Court need not address choice of law *sua sponte*, it may raise it as it has here by requesting that the parties provide supplemental briefs on the issue of whether New York law applies to the claims brought against Defendant. *See Henneberry v. Sumitomo Corp. of Am.,* No. 04 Civ. 2128, 2005 WL 991772, at *5 n. 3 (S.D.N.Y. Apr. 27, 2005). As the supplemental briefs indicate, an actual conflict exists between New York and Sierra Leone law, and more broadly between United States law and the English law on which West African countries rely, with respect to the causes of action that are recognized in each jurisdiction (i.e., English law does not recognize separate causes of action for

26

negligent supervision, intentional infliction of emotional distress or negligent retention, while

New York law does recognize those separate causes of action) and the threshold for an award

of punitive damages (i.e., English law awards punitive damages in exceptional circumstances,

while New York law awards said damages where there is mere willful or wanton negligence or

recklessness).  These differences may have a significant possible effect on the outcome of a trial

in this case.  Therefore, given that an actual conflict exists between these laws, the Court

proceeds to address which state has the most significant interest in this litigation.

In weighing the interest of the competing states, the Court applies the principle of *lex

loci delicti* – applying the law of the place where the tort occurred – since the common laws at

issue here regulate conduct.  In this case, the conduct underlying each of the causes of action -

negligent supervision and direction, negligent, reckless, and willful misconduct, negligent

infliction of emotional distress, negligent retention, fraud, and fraudulent inducement -

occurred in West Africa, as discussed in more detail below.  Therefore, the laws of West Africa

(specifically, Sierra Leone law with respect to the claims of negligent supervision and direction,

negligent, reckless, and willful misconduct, negligent infliction of emotional distress, negligent

retention, and fraud; and Liberia law with respect to the claim for fraudulent inducement[11])

apply to the claims in this case.  While Plaintiff argues that the Court should deviate from this

---

[11] The conduct underlying the claim of fraudulent inducement occurred in Liberia, because Kamara was located in Liberia when he omitted critical facts related to the secondment (i.e., the corruption and misconduct of individuals in leadership positions at BRAC Sierra Leone).  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999) (In the context of an omission, "[t]he failure of a man to do anything at all when he is physically in one State is not an "act" done or "committed" in another State. His decision not to act and his not acting are both personal events occurring in the physical situs. That they may have consequences elsewhere does not alter their personal localization as acts.").

principle and apply the law of the state where Plaintiff suffered the greatest injury, in Plaintiff's view New York, the Court disagrees with Plaintiff's assessment.  Here, as discussed in greater detail below, Plaintiff's TAC and related materials assert that the actions giving rise to Plaintiff's injuries occurred in West Africa and that he suffered his injuries while residing there.  TAC ¶¶ 207-08, 250-51, 331.  Accordingly, Sierra Leone law applies to the claims in this case.  Plaintiff, however, has not asserted claims specifically under Sierra Leone law – his claims are all based on New York common law.  And, Defendant has provided information stating that Sierra Leone and Liberia do not recognize the negligence claims asserted, whereas Plaintiff has not identified any Sierra Leone law on which he relies.  Further, even if New York law applied, for the reasons discussed below, the claims are not plausible under New York law.

2. **Plaintiff's Negligence Claims**

    i. **Whether the Negligence Claims are Barred by the Workers' Compensation Law**

Defendant argues that New York Workers' Compensation Law bars Plaintiff's negligence claims because Plaintiff was a special employee of BRAC International.  In New York, it is well established that the Workers' Compensation Law provides the exclusive remedy for workplace injuries.  Workers' Comp. Law § 11.  Indeed, the New York state court dismissed Plaintiff's negligence claims against BRAC USA for this very reason.  *See Wheeler v. BRAC USA, Inc., et al.*, Index No. 153218/2023 (Sup. Ct. N.Y. County 2023) (Doc. No. 22, Decision and Order on Motion).  The same law would bar Plaintiff's negligence claims if he is deemed to have been in a "special employment relationship" with BRAC International.

"A special employee is described as one who is transferred for a limited time of whatever duration to the service of another." *Thompson v. Grumman Aerospace Corp.*, 78 N.Y.2d 553, 557 (1991) (citations omitted). Whether a special employment relationship exists can be decided by the court as a matter of law "where the particular, undisputed critical facts compel that conclusion and present no triable issue of fact." *Id.* at 557-58. Many factors are relevant to whether a special employment relationship exists, though no one factor is decisive. *Id.* However, an important factor is whether the alleged special employer "controls and directs the manner, details and ultimate result of the employee's work." *Id.* at 558 (citations omitted). Also important is "whether the plaintiff was aware of and consented to the special employment relationship." *Bernier v. Gabriel Contracting*, 6 A.D.3d 369, 371 (2d Dep't 2004) (citations omitted); *see also Zupan v. Irwin Contracting, Inc.*, 145 A.D.3d 715, 718 (2d Dep't 2016) (holding that "the employee must have had knowledge of, and consented to, the special employment relationship") (citations omitted). "The determination as to whether a special employment relationship exists is generally an issue of fact requiring consideration of many factors, including who controls and directs the manner of the employee's work, who is responsible for payment of wages and benefits, who furnishes equipment, who has the right to discharge the employee, and whether the work being performed was in furtherance of the special employer's or the general employer's business." *Dube v. Cty. of Rockland*, 75 N.Y.S.3d 239, 241-42 (2d Dep't 2018) (refusing to find a special employment relationship where the general employer paid the plaintiff's wages and benefits and retained authority to discharge and discipline him). "General employment is presumed to continue, and the presumption can only be rebutted by a 'clear

demonstration of surrender of control by the general employer and assumption of control by the special employer.'"  *Id.*

Because of the fact-based nature of the issue of whether a plaintiff is a special employee, this issue is typically not decided on a motion to dismiss where the court must construe all facts in favor of the plaintiff.  And here, Plaintiff points to facts that indicate that BRAC USA did not surrender control over Plaintiff's employment when he was seconded to BRAC Sierra Leone.  These include that he remained employed by BRAC USA, was required to coordinate with Stoner for administrative needs, and complained to Stoner and Naughton (and others) at BRAC USA about the activities of Kamara, Jarfoi and Momoh.  Moreover, Stoner actually told Plaintiff to investigate the misconduct, suggesting that BRAC USA had some control over Plaintiff's work.  These facts render it plausible that Plaintiff was not a special employee of BRAC International.  Defendant cites to no case deciding the issue of special employee status as a matter of law on a motion to dismiss.  In contrast, Plaintiff cites to a number of cases supporting his position that this is a factual issue that cannot be decided at this juncture.  *See Kiss v. Clinton Green North, LLC*, 2020 WL 4226564, at *2-3 (S.D.N.Y. July 23, 2020) (denying defendant's motion for summary judgment on New York common law negligence claim because defendant did not pay Plaintiff and did not furnish equipment to Plaintiff); *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 7 Civ. 1588, 2015 WL 13680357, at *3 (S.D.N.Y. Apr. 17, 2015) (refusing to find special employment relationship even though third-party company supervised/directed workers because general employer provided similar supervision); *Medrano v. Aramark Healthcare Techs., LLC*, 2015 WL 4750703, at *5 (S.D.N.Y. Aug. 11, 2015)

(refusing to find special employment relationship even though the third-party company supervised/managed all aspects of the employee's work).  Thus, if New York law applied, the state's Workers' Compensation Law does not provide a basis for dismissing the negligence claims at the Rule 12 stage.  Nevertheless, for the reasons stated below, the negligence claims are not plausibly pled.

### ii.   Whether Plaintiff Has Plausibly Pled Negligent Supervision/Retention Claims

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship, (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels."  *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (citations and internal quotation marks omitted); *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81, 94 (2d Cir.2011) (same); *Aasir Azzarmi v. Neubauer*, No. 20-CV-9155 (KMK), 2024 U.S. Dist. LEXIS 173355, at *66 (S.D.N.Y. Sep. 24, 2024) (same).

While Plaintiff alleges that Jarfoi, Momoh, and Kamara acted in the course and scope of their employment with BRAC International (TAC ¶ 360), this is contradicted by Plaintiff's earlier acknowledgment in the TAC that these individuals were employees of BRAC Sierra Leone and/or BRAC Liberia.  TAC ¶¶ 43-44, 52.  *See Cha v. Hooters of Am., LLC*, No. 12-CV-4523(DLI)(JMA), 2013 U.S. Dist. LEXIS 144750, at *15 (E.D.N.Y. Sep. 30, 2013) (dismissing a claim

for negligent supervision on the grounds that the complaint was devoid of any allegations that the defendant was an employer of the alleged tortfeasor).

Further, the TAC contains no factual allegations to support Plaintiff's proposition that BRAC International knew or should have known that these alleged tortfeasors had the propensity to engage in misconduct prior to Plaintiff taking the secondment and then raising complaints to BRAC USA and BRAC International.  While "BRAC Sierra Leone's unethical predatory payday loan scheme was uncovered by The Guardian in December 2019"[12] (TAC ¶ 212 n.11), prior to Plaintiff taking the secondment, this fact alone does not demonstrate that BRAC International had knowledge that Jarfoi, Momoh, and Kamara had the propensity to engage in the type of misconduct alleged in the TAC.[13]  The article does not reference Jarfoi, Momoh or Kamara by name and does not discuss sexual favors, or the specific financial misfeasance alleged in the TAC.

Moreover, Plaintiff fails to plead facts showing that the tort was committed on BRAC International's premises or with BRAC International's chattels.  BRAC International's premises are located in the Netherlands and Plaintiff alleges that the tort occurred in Sierra Leone.  While Plaintiff argues that BRAC Sierra Leone was BRAC International's premises because BRAC International controlled and exercised dominion over BRAC Sierra Leone, these allegations are

---

[12] *See* Mara Kardas-Nelson, Microfinance Lenders in Sierra Leone Accused of 'Payday Loan' Interest Rates, The Guardian, December 12, 2019, https://www.theguardian.com/global-development/2019/dec/12/microfinance-lenders-in-sierra-leone-accused-of-payday-loan-interest-rates (last visited June 12, 2025).

[13] The Court may, and does, take judicial notice of The Guardian article not for its truth but as evidence that certain information was said in the press.  *See Press v. Primavera*, 685 F. Supp. 3d 216, 224 (S.D.N.Y. 2023) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)) ("The Second Circuit has made clear that a court may take judicial notice of publicly filed documents, not 'offered for the truth of the matter asserted,' but instead offered for other relevant reasons, such as 'to show that certain things were said in the press . . .'").

based on generalized, conclusory statements (e.g., "BRAC International had ultimate control and authority over the physical premises of each Country Office." (TAC ¶ 163); "[T]he BRAC Sierra Leone Country Office physical premises were Defendant BRAC International's premises and, therefore, the immoral, unethical and illegal actions described herein occurred on Defendant BRAC International's premises." (TAC ¶ 324)).  *See, e.g, Fisher v. Hudson Hall LLC*, 2023 U.S. Dist. LEXIS 147803, at *4 (S.D.N.Y. Aug. 21, 2023) ("threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice" to plausibly plead a claim). Further, Plaintiff altogether fails to argue that the tort was committed with BRAC International's chattels.  Therefore, Plaintiff fails to plead plausible negligent supervision and retention claims.

### iii.  Whether Plaintiff Has Plausibly Pled a Claim of Negligent, Reckless and Willful Misconduct

"To prevail on a negligence claim, a plaintiff must establish '(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 332 (S.D.N.Y. 2015). In ascertaining whether a party owes a duty of care to another, "New York recognizes only certain, well-established 'special relationships' [such as] (1) employers with respect to their employees, [and] (2) owners of premises with respect to those who occupy those premises . . ." *Id.*  The standards for a negligence claim are identical for a reckless and willful misconduct claim.  *See PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 568 (E.D.N.Y. 2021). However, reckless and willful misconduct claims also require allegations demonstrating "conduct that evinces a reckless disregard for the rights of others or smacks of intentional

33

wrongdoing." *Id.*; *see also C.Q. v. Estate of Rockefeller*, No. 20-CV-2205 (VSB), 2021 U.S. Dist.

LEXIS 203563, at *22-23 (S.D.N.Y. Oct. 21, 2021) ("Recklessness in the context of a gross

negligence claim means an extreme departure from the standards of ordinary care, such that

the danger was either known to the defendant or so obvious that the defendant must have

been aware of it.").

 As with his negligent supervision and retention claims, Plaintiff's claim of negligent,

reckless and willful misconduct fails for the same reasons as the other negligence claims –

because Plaintiff pleads insufficient facts to establish an employer-employee relationship

between Jarfoi, Momoh, and Kamara and BRAC International.  Plaintiff acknowledges in the TAC

that Kamara, Jarfoi, and Momoh were employees of BRAC Sierra Leone and/or BRAC Liberia,

not BRAC International.  TAC ¶¶ 43-44, 52.  Further, Plaintiff admits that during his secondment

he remained employed by BRAC USA, not BRAC International.  TAC ¶ 189.  As such, BRAC

International did not have an employee-employer relationship with Plaintiff or with Jarfoi,

Momoh and Kamara that would create a duty of care running to Plaintiff to protect him from

misconduct by BRAC Sierra Leone employees.  The complaint also fails to allege facts supporting

a plausible inference that BRAC International recklessly disregarded the rights of others or that

smack of intentional wrongdoing.  Therefore, Plaintiff fails to plead a plausible negligent,

reckless and willful misconduct claim.

  **iv.  Whether Plaintiff Has Plausibly Pled Negligent Infliction of Emotional Distress**

 Under New York law, there are limited contexts in which a claim of negligent infliction of

emotional distress may be viable.  A plaintiff must plead, one of three "theories": (1) a

bystander theory, (2) a direct duty theory, or (3) a special circumstances theory. *See Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000). The first two theories require physical injury or the threat of danger, either to the plaintiff himself or to a close family member. *Id.* The special circumstances theory is rarely applicable. An example would be being misinformed of the death of a family member or misdiagnosed with a terminal illness or the mishandling of a corpse. *Baker*, 239 F.3d at 421.

The only plausible theory in this action would be the direct duty theory, which requires a plaintiff to allege that "[]he suffer[ed] an emotional injury from defendant's breach of a duty which unreasonably endangered [his] own physical safety." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). This duty "must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Id.* The direct duty theory also requires "an objective inquiry turning on whether a plaintiff's physical safety was actually endangered, not a subjective evaluation dependent on the plaintiff's state of mind." *Carney v. Bos. Mkt.*, No. 18 Civ. 713 (LGS), 2018 WL 6698444, at *3 (S.D.N.Y. Dec. 20, 2018) (quotation marks omitted).

Here, Plaintiff fails to plead any physical injury or plausible threat of danger to himself in connection with the conduct of Kamara, Jarfoi, Momoh or otherwise. The complaint vaguely asserts that Plaintiff feared for his safety because Jarfoi and Momoh had powerful connections and because he was told to be "careful." TAC ¶¶ 220, 222-23, 258-59. This is wholly insufficient to state a claim. Indeed, Plaintiff cites to no case holding that these facts, if credited as true, are sufficient to state a negligent infliction of emotional distress claim. In contrast, it is typical for courts to dismiss negligent infliction of emotional distress claims at the

35

pleading stage.  *See, e.g., Cano v. SEIU Local 32BJ*, 19 Civ. 8810, 2021 WL 4480274 (S.D.N.Y.

Sept. 30, 2021); *Vaughn v. American Multi Cinema, Inc.*, 2012 WL 3835191 (S.D.N.Y. Sept. 13,

2010); *Carney*, 2018 WL 6698444; *Chan v. Donovan*, 357 F. Supp.3d 276 (S.D.N.Y. 2019).  Thus,

the motion should be granted as to this claim.

### 3.  Plaintiff's Fraud Claim

To properly plead a claim for fraud, "plaintiffs must establish 'a misrepresentation or a

material omission of fact which was false and known to be false by defendant, made for the

purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the

misrepresentation or material omission, and injury."  *Jing Wang v. Tesla, Inc.*, No. 20-CV-3040

(NGG)(SJB), 2021 WL 3023088, at *3 (E.D.N.Y. July 16, 2021).  Although pleading most claims

requires only that a party provide "a short and plain statement of the claim showing that the

pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), claims of fraud are required by Rule 9(b) to

"state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

Specifically, a party alleging fraud must "(1) specify the statements that the [claimant] contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

290 (2d Cir. 2006).  In addition to those elements that must be pleaded with particularity,

"[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged

generally."  Fed. R. Civ. P. 9(b).  Rule 9(b) is implicated not only by direct allegations of fraud,

but for "all averments of fraud or mistake, whatever may be the theory of legal duty —

statutory, common law, tort, contractual, or fiduciary."  *In re Harbinger Capital Partners Funds*

*Inv'r Litig.*, No. 12–cv–1244, 2015 WL 1439520, at *10 (S.D.N.Y. Mar. 30, 2015); *see also*

*Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir.2004) (applying Rule 9(b) when "wording and

imputations of the complaint are classically associated with fraud").  Rule 9(b) requires a

claimant to "state with particularity the specific facts in support of [her] belief that defendants'

statements were false when made."  *Rombach*, 355 F.3d at 172 (brackets omitted); *see also*

*Litchhult v. USTRIVE2, Inc.*, No. 10–cv–3311, 2011 WL 3877084, at *6 (E.D.N.Y. Sept. 1, 2011)

(collecting cases).

Here, Plaintiff makes the conclusory allegation that BRAC International made

"intentional materially false representations" when Kamara – a BRAC Sierra Leone employee--

made certain statements about the employment status of Jarfoi and Momoh (whether they

were or would be terminated or resign) to Plaintiff from February 22, 2021 to March 18, 2021.

TAC ¶¶ 290-94, 301-302, 394.  The statements made on February 22, 2021 were that Jarfoi and

Momoh had been dismissed from BRAC Sierra Leone in December 2020.  Yet, Plaintiff admits

that he knew that this statement was untrue because he was working at BRAC Sierra Leone and

was complaining about their ongoing misconduct to various people.  He also pleads that

Kamara told him on his first day of work that they were still working there.  TAC ¶ 207.  Thus,

he could not have relied on this statement in any way.  The statement made in March was that

Jarfoi and Momoh were "allegedly going to resign by May 31, 2021" and would be put on

medical leave until then.  Plaintiff offers no facts to suggest that this statement was false when

made and no facts at all regarding whether Jarfoi or Momoh remained at BRAC Sierra Leone

after May 31, 2021.  Rather, the complaint suggests that Jarfoi and Momoh were in fact put on

medical leave and that Plaintiff objected to this because he believed they did not qualify for such leave and that the medical leave payments were fraudulent.  He does not state in the complaint how he relied on this statement.  The only thing he did after hearing this statement was continue to do his job, which entailed soliciting donations for BRAC Sierra Leone and spending donor funds while knowing that funds were being used to make leave payments to Jarfoi and Momoh, which he characterizes as being violative of BRAC International's contract with BRAC USA regarding use of donated funds/grants.  TAC ¶ 395.  For these reasons, Plaintiff fails to plead a plausible fraud claim.  *See DF Ventures, LLC v. Aaron & Gianna, PLC*, 2024 U.S. Dist. LEXIS 37407, at *39 (S.D.N.Y. Mar. 4, 2024) (a plaintiff must plausibly plead "justifiable reliance" for their fraud claim to survive a Rule 12(b)(6) motion); *see also Allison v. Round Table Inv. Mgmt., Co., LP*, 447 Fed. Appx. 274 (2d Cir. Jan. 12, 2012) (affirming dismissal and noting that plaintiff-appellant did not "sufficiently plead fraudulent intent, reasonable reliance, and causation of damages"); *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. Appx. 102, 106 (2d Cir. Jan. 19, 2012) ("the proposed amended complaint utterly fails to allege facts sufficient to plead fraudulent inducement as it only alleges in conclusory fashion that defendant 'used deceit, deception and coercion to get what it wanted; including inducing [plaintiff].").

Plaintiff cites to only one case in his effort to avoid dismissal of this claim, but it does not assist him in his argument because unlike this case, that case involved misstatements made in the context of publicly filed financial statements by individuals who admitted to knowing the statements were false when they were made, and it is implied that the investors who relied on

the misstatements did not know they were false.  *Dragon State v. Keyuan Petrochemicals, Inc*.,

2016 WL 439022 (S.D.N.Y. Feb. 3, 2016).

### 4.  Plaintiff's Fraudulent Inducement/Fraudulent Omission Claim

To properly state a claim of fraudulent inducement under New York law, "there must be

a knowing misrepresentation of material present fact, which is intended to deceive another

party and induce that party to act on it, resulting in injury."  *Cohen v. Avanade, Inc.*, 874 F.

Supp. 2d 315, 323 (S.D.N.Y. 2012).  Further, this claim also must satisfy the heightened pleading

requirement for fraud claims pursuant to Federal Rule of Civil Procedure 9(b).  *Id.* at 324.

Plaintiff states that the misconduct at issue was public knowledge by January 2021.  TAC

¶¶ 207, 211, 219.  Plaintiff, however, fails to offer facts to support an inference that Kamara

knew of the misconduct in December 2020, when Plaintiff attended a video call in which

Kamara – a BRAC Sierra Leone employee -- allegedly attempted to convince Plaintiff to accept

the temporary assignment in West Africa by speaking in glowing terms and with reassuring

encouragement about the opportunity and failing to disclose any prior or ongoing unethical,

immoral, or unlawful activities at BRAC Sierra Leone.  TAC ¶¶ 42, 52, 184-85.  The precise words

used by Kamara are not provided.  In any event, this claim as pleaded relies on allegedly

fraudulent *omissions* pleaded in the most general way -- asserting "Kamara made this material

omission with knowledge that his statements describing the proposed temporary position in

glowing terms were false"  (TAC ¶ 411), and that Kamara made a significant material omission

of fact during the December 2020 video call when he intentionally failed to tell Plaintiff

Wheeler about the ongoing unethical, immoral, and illegal activities at BRAC Sierra Leone (TAC

¶ 410)).  This is not sufficient to support a plausible claim of fraudulent inducement.  *See Valley*

*Lane Indus. Co.*, 455 Fed. Appx. at 106 (conclusory allegations of the elements of a fraudulent

inducement claim are insufficient to plausibly plead such claim); *Henderson v. Golden Corral*

*Franchising Systems, Inc.*, 663 F.Supp.3d 313, 332 (S.D.N.Y. 2023) (dismissing fraudulent

inducement/fraudulent omission claims because plaintiff failed to describe the conduct and

statements on which plaintiff relied with specificity).  Further, in the case of an allegedly

fraudulent omission, a duty to disclose arises "where the parties enjoy a fiduciary relationship"

or "where one party possesses superior knowledge, not readily available to the other, and

knows that the other is acting on the basis of mistaken knowledge."  *Lerner*, 459 F.3d at 292.

Plaintiff fails to plead sufficient facts to demonstrate a fiduciary relationship or that Kamara or

BRAC International knew Plaintiff was acting on the basis of mistaken knowledge about the

circumstances on the ground in Sierra Leone – all that is alleged is the vague assertion that

Kamara spoke in glowing terms about working at BRAC Sierra Leone.  Accordingly, Plaintiff fails

to plead a plausible fraudulent inducement claim.

The case relied upon by Plaintiff is factually distinguishable because the defendants in

that case misrepresented the nature of the work plaintiff would be doing and did so knowingly,

whereas in this case, no misrepresentations were made to Plaintiff about the nature of the

work he would be performing, but instead, Plaintiff was allegedly not informed about the

allegedly unethical and unlawful conduct of certain employees of BRAC Sierra Leone, and it is

unclear from the complaint exactly what statements were made that would render the alleged

fraudulent omissions material or show that Plaintiff was relying on mistaken information when

40

deciding to accept the secondment.  *Laduzinski v. Alvarez & Marsal Tax LLC*, 132 A.D.3d 164, 167-69 (1st Dept. 2015).

## **CONCLUSION**

For the reasons stated above, I respectfully recommend that Defendant's Motion to Dismiss be GRANTED.

DATED:     June 18, 2025
              New York, New York

Respectfully submitted,

KATHARINE H. PARKER
United States Magistrate Judge

41

**NOTICE**

**Plaintiff and Defendant shall each have fourteen days from this date to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) to this Report and Recommendation. If Defendant files written objections to this Report and Recommendation, Plaintiff may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P.72(b)(2). If Plaintiff files written objections, Defendant may respond to the objections within fourteen days.**

**Objections and responses to objections shall be filed with the Clerk of Court, with courtesy copies delivered to the Hon. Gregory H. Woods at 500 Pearl Street, New York, NY 10007-1312, to the chambers of the undersigned magistrate judge, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any request for an extension of time to file objections must be directed to Judge Woods. Failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).**